# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| HAL YUROW, derivatively on behalf of FORD MOTOR COMPANY, | Case No.: 2:24-cv-13222 |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| JAMES D. FARLEY, JR., JOHN T. LAWLER, KIMBERLY A. CASIANO, ALEXANDRA FORD ENGLISH, HENRY FORD III, WILLIAM CLAY FORD, JR., WILLIAM HELMAN IV, WILLIAM E. KENNARD, JOHN C. MAY, BETH E. MOONEY, LYNN VOJVODICH RADAKOVICH, JOHN L. THORNTON, JOHN B. VEIHMEYER, and JOHN S. WEINBERG, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| FORD MOTOR COMPANY, | |
| Nominal Defendant. | |

**INTRODUCTION**

Plaintiff Hal Yurow ("Plaintiff"), by and through his undersigned attorneys, derivatively and on behalf of nominal defendant Ford Motor Company ("Ford" or the "Company"), brings this derivative action against defendants James D. Farley, Jr., John T. Lawler, Kimberly A. Casiano, Alexandra Ford English, Henry Ford, III, William Clay Ford, Jr., William Helman, IV, William E. Kennard, John C. May, Beth E. Mooney, Lynn Vojvodich Radakovich, John L. Thornton, John B. Veihmeyer, and John S. Weinberg (collectively, the "Individual Defendants," and together with Ford, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Ford and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon his attorney's investigation, including, *inter alia*, an evaluation of: (i) Ford's publicly available documents; (ii) Ford's conference calls and press releases; (iii) United States Securities and Exchange Commission ("SEC") filings; (iv) legal filings; (v) news publications; (vi) analyst reports pertaining to Ford; and (vii) information readily obtainable on the Internet.

**NATURE OF ACTION**

1.      This is a shareholder derivative action brought on behalf of Ford

2

against the Individual Defendants for wrongdoing committed between October 28, 2021 and July 24, 2024, both dates inclusive (the "Relevant Period").

2.      Ford is an automotive company that develops, manufactures, and sells its line of innovative trucks, SUVs, commercial vehicles, and Lincoln luxury vehicles. The Company's business is made up of three segments: Ford Blue, which provides gas-powered and hybrid vehicles; Ford Model e, which develops electric vehicles; and Ford Pro, which suits vehicles and services towards customer needs.

3.      During the Relevant Period, Ford's quality assurance procedures for its vehicles were deficient. Due to the foregoing, Ford was forced to pay out warranties at a higher rate, resulting in higher warranty costs for the Company. Despite this, Ford's warranty reserves were not up to date with the quality assurance issues with vehicles, and therefore they were improperly funded. As such, the warranty reserve numbers Ford was reporting on its financial reports with the SEC, and therefore its profitability numbers that were reported to the SEC, were wholly inaccurate. However, throughout the Relevant Period, the Individual Defendants kept this reality concealed from investors.

4.      For example, on April 28, 2022, Ford filed its quarterly report on Form 10-Q with the SEC for the first quarter of the fiscal year ended December 31, 2022 (the "2022 Fiscal Year") (the "1Q22 10-Q"). With respect to "changes in accrual to pre-existing warranties," the 1Q22 10-Q represented that Ford had an "estimate of

reasonably possible costs in excess of [the Company's] accruals for material field service actions and customer satisfaction actions" in a "range of up to about $700 million in the aggregate."

5.    The truth began to emerge on July 24, 2024 when, after the market closed,  Ford published a press release announcing its results for the second quarter of the fiscal year ended on December 31, 2024 (the "2024 Fiscal Year) (the "2Q24 Press Release). The 2Q24 Press Release disclosed, among other things, that "[p]rofitability was affected by an ***increase in warranty reserves***" as well as "***higher warranty costs***."[1] Because of these increases, the 2Q24 Press Release announced revised full year guidance for the 2024 Fiscal Year of the Ford Model e segment that "reflect[s] ***higher warranty costs than originally planned***."

6.    Following the release of the 2Q24 Press Release, the truth completely emerged when outlets including *The Associated Press* and *The Washington Post* reported that, in the second quarter of the 2024 Fiscal Year, the Company's warranty and recall costs were $2.3 billion, $800 million greater than the first quarter of the 2024 Fiscal Year, and $700 million greater than the second quarter of the fiscal year ended December 31, 2023 (the "2023 Fiscal Year").

7.    On this news, the price of the Company's common stock fell $2.51 per share, or approximately 18.4%, from a closing price of $13.67 per share on July 24,

---

[1] Unless otherwise noted, all emphasis is added.

2024, to a closing price of $11.16 per share on July 25, 2024.

8.     During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's quality assurance procedures for its vehicles had been deficient since the start of the Relevant Period; (2) as such, Ford had begun to experience higher warranty costs; (3) due to the foregoing, Ford's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) Ford's profitability was therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of a new Long Term Incentive Plan (the "2023 LTIP") and Non-Employee Director Stock Plan (the "2024 Stock Plan"); and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and

misleading statements and omissions of material fact, while, during the Relevant Period, three of the Individual Defendants sold Company shares at inflated prices for combined total proceeds of approximately $2.4 million.

10.   The Individual Defendants also breached their fiduciary duties by causing Ford to fail to maintain internal controls.

11.   In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Ford to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between November 2022 and June 2024, approximately 54,780,000 shares of Ford common stock were repurchased, costing the Company *over $727.2 million*. As Ford's stock was actually worth only $11.16 per share, the price at which it was trading when markets closed on July 25, 2024, Ford overpaid for repurchases of its own stock *by over $115.9 million* in total.

12.   Ford has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.   In light of the Individual Defendants' misconduct—which has subjected Ford, its President and Chief Executive Officer ("CEO"), and its Vice Chairman and Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of

Michigan (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14.     Demand is excused as to Ford's Board because they cannot consider a demand to initiate litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence required. In light of the Individual Defendants'—most of whom are Ford's current directors—breaches of fiduciary duty, their collective participation in the fraud, their receipt of material benefits from the 2023 LTIP and the 2024 Stock Plan, the substantial likelihood of their liability in this derivative action, the President and CEO's and Vice Chairman and CFO's liability in the Securities Class Action, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## **THE PARTIES**

### **Plaintiff Yurow**

19.     Plaintiff is a Ford stockholder who first purchased Company stock on

8

February 4, 2022 and has continuously owned Company stock since then.

**Nominal Defendant Ford**

20.     Ford is a Delaware corporation with its principal executive offices at One American Road, Dearborn, Michigan 48126. Ford's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "F."

**Defendant Farley**

21.     Defendant James D. Farley ("Farley") has served as Ford's President, CEO and as a Company director since October 2020. As of February 1, 2024, Defendant Farley owned 4,657,831 shares of Ford's common stock. At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant Farley owned approximately $56.4 million worth of Ford common stock as of that date.

22.     Defendant Farley's compensation from the Company for the fiscal year ended December 31, 2021 (the "2021 Fiscal Year") was $22,813,174, which was made up of $1,700,000 in salary, $16,078,486 in stock awards, $3,672,000 in non-equity incentive plan compensation, and $1,362,688 in all other compensation. Defendant Farley's compensation from the Company for the 2022 Fiscal Year was $20,996,146, which was made up of $1,700,000 in salary, $15,145,381 in stock awards, $2,754,000 in non-equity incentive plan compensation, and $1,396,765 in all other compensation. Defendant Farley's compensation from the Company for the

2023 Fiscal Year was $26,470,033, which included $1,700,000 in salary, $20,329,795 in stock awards, $2,399,040 in non-equity incentive plan compensation, and $2,041,198 in all other compensation.

23.     Defendant Farley also sold 79,921 shares of Ford stock at artificially inflated prices while in possession of inside information. Defendant Farley received approximately $1,027,863 in proceeds from the insider sales, exposing his motive for taking part in the misconduct.

**Defendant Lawler**

24.     Defendant John T. Lawler ("Lawler") has served as Ford's CFO since October 2020 and was appointed as Ford's Vice Chair on June 3, 2024. As of February 1, 2024, Defendant Lawler owned 942,741 shares of the Company's common stock and 75 shares of Ford common stock units.[2] At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant Lawler owned approximately $11.4 million worth of Ford common stock as of that date.

25.     Defendant Lawler's compensation from the Company for the 2021 Fiscal Year was $9,428,325, which was made up of $1,014,500 in salary, $750,390 in bonus, $5,035,993 in stock awards, $1,250,640 in non-equity incentive plan

---

[2] "Ford common stock units" are defined in the 2024 Proxy Statement as "common stock units credited under a deferred compensation plan and payable in cash and, in the cases of William Clay Ford, Jr. and John T. Lawler, include stock units under a benefit equalization plan."

compensation, $1,256,804 in change in pension value and nonqualified deferred compensation earnings, and $119,998 in all other compensation. Defendant Lawler's compensation from the Company for the 2022 Fiscal Year was $8,956,211, which was made up of $1,124,850 in salary, $6,535,903 in stock awards, $1,112,355 in non-equity incentive plan compensation, and $183,103 in all other compensation. Defendant Lawler's compensation from the Company for the 2023 Fiscal Year was $10,031,212, which was made up of $1,187,250 in salary, $5,407,923 in stock awards, $1,414,350 in non-equity incentive plan compensation, $1,883,255 in change in pension value and nonqualified deferred compensation earnings, and $138,434 in all other compensation.

26.     Defendant Lawler also sold 29,821 shares of Ford stock at artificially inflated prices while in possession of inside information. Defendant Lawler received approximately $389,611 in proceeds from the insider sales, exposing his motive for taking part in the misconduct.

**Defendant Casiano**

27.     Defendant Kimberly A. Casiano ("Casiano") has served as a Ford director since 2003 and also serves as a member of the Audit Committee, the Nominating and Governance Committee, and the Sustainability, Innovation and Policy Committee. As of February 1, 2024, Defendant Casiano beneficially owned 233,603 shares of the Company's common stock and 183,823 shares of Ford

common stock units. At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant Casiano owned approximately $2.8 million worth of Ford common stock as of that date.

28.     Defendant Casiano's compensation from the Company for the 2021 Fiscal Year was $365,236, which was made up of $100,000 in fees earned or paid in cash, $214,990 in stock awards, and $50,245 in all other compensation. Defendant Casiano's compensation from the Company for the 2022 Fiscal Year was $350,345, which was made up of $100,000 in fees earned or paid in cash, $214,993 in stock awards, and $35,352 in all other compensation. Defendant Casiano's compensation from the Company for the 2023 Fiscal Year was $331,441, which was made up of $100,000 in fees earned or paid in cash, $214,991 in stock awards, and $16,450 in all other compensation.

**Defendant English**

29.     Defendant Alexandra Ford English ("English") has served as a Ford director since 2021. She also served as an employee of Ford between July 2017 and June 2022, most recently serving as Director of Global Brand Merchandising. In addition, Defendant English serves as a member of the Finance Committee and the Sustainability, Innovation and Policy Committee. As of February 1, 2024, Defendant English beneficially owned 26,860 shares of the Company's common stock and 1,406,945 shares of the Company's Class B stock. At the close of trading on

February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant English owned approximately $325,006 worth of Ford common stock as of that date.

30.    Defendant English's compensation from the Company for the 2021 Fiscal Year was $571,701, which was made up entirely of all other compensation. Defendant English's compensation from the Company for the 2022 Fiscal Year was $517,924, which was made up of $50,000 in fees earned or paid in cash, $107,487 in stock awards, and $360,437 in all other compensation. Defendant English's compensation from the Company for the 2023 Fiscal Year was $383,710, which was made up of $314,990 in stock awards and $68,720 in all other compensation.

**Defendant H. Ford**

31.    Defendant Henry Ford, III ("H. Ford") has served as a Ford director since 2021. He also served as an employee of Ford from February 2006 until June 2021, most recently serving as Director of Investor Relations. In addition, Defendant H. Ford is a member of the Finance Committee and the Sustainability, Innovation and Policy Committee. As of February 1, 2024, Defendant H. Ford beneficially owned 50,153 shares of the Company's common stock and 1,691,807 of the Company's Class B stock. At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant H. Ford owned approximately $606,851 worth of Ford common stock as of that date.

32.    Defendant H. Ford's compensation from the Company for the 2021

Fiscal Year was $331,401, which was made up of $50,000 in fees earned or paid in cash, $107,497 in stock awards, and $173,904 in all other compensation. Defendant H. Ford's compensation from the Company for the 2022 Fiscal Year was $366,981, which was made up of $100,000 in fees earned or paid in cash, $214,993 in stock awards, and $51,988 in all other compensation. Defendant H. Ford's compensation from the Company for the 2023 Fiscal Year was $369,454, which was made up of $100,000 in fees earned or paid in cash, $214,991 in stock awards, and $54,463 in all other compensation.

**Defendant W. Ford**

33.     Defendant William Clay Ford, Jr. ("W. Ford") has served as a Ford director since 1988. He has also served as the Board's Executive Chairman since January 1999. Previously, Defendant W. Ford served as CEO of the Company from October 2001 until September 2006. He is also the Chair of the Finance Committee and a member of the Sustainability, Innovation and Policy Committee. As of February 1, 2024, Defendant W. Ford owned 2,949,527 shares of the Company's common stock, 276,200 shares of Ford common stock units, and 19,592,914 shares of Company's Class B stock. At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant W. Ford owned approximately $35.7 million worth of Ford common stock as of that date.

34.     Defendant W. Ford's compensation from the Company for the 2021

Fiscal Year was $18,662,706, which was made up of $1,700,000 in salary, $13,785,209 in stock awards, $1,080,000 in non-equity incentive plan compensation, and $2,097,497 in all other compensation. Defendant W. Ford's compensation from the Company for the 2022 Fiscal Year was $17,302,266, which was made up of $1,700,000 in salary, $12,847,472 in stock awards, $810,000 in non-equity incentive plan compensation, and $1,944,794 in all other compensation. Defendant W. Ford's compensation from the Company for the 2023 Fiscal Year was $20,613,100, which was made up of $1,700,000 in salary, $15,848,199 in stock awards, $705,600 in non-equity incentive plan compensation, $155,876 in change in pension value and nonqualified deferred compensation earnings, and $2,203,425 in all other compensation.

**Defendant Helman**

35.     Defendant William Helman, IV ("Helman") has served as a Ford director since 2011. He also serves as the Chair of the Sustainability, Innovation and Policy Committee and a member of the Finance Committee and the Nominating and Governance Committee. As of February 1, 2024, Defendant Helman beneficially owned 239,367 shares of the Company's common stock and 49,067 shares of Ford common stock units. At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant Helman owned approximately $2.9 million worth of Ford common stock as of that date.

36.     Defendant Helman's compensation from the Company for the 2021 Fiscal Year was $335,705, which was made up of $120,000 in fees earned or paid in cash, $214,990 in stock awards, and $715 in all other compensation. Defendant Helman's compensation from the Company for the 2022 Fiscal Year was $339,855, which was made up of $120,000 in fees earned or paid in cash, $214,993 in stock awards, and $4,861 in all other compensation. Defendant Helman's compensation from the Company for the 2023 Fiscal Year was $353,857 in total compensation, which was made up of $120,000 in fees earned or paid in cash, $214,991 in stock awards, and $18,866 in all other compensation.

**Defendant Kennard**

37.     Defendant William E. Kennard ("Kennard") has served as a Ford director since 2015. He also serves as the Chair of the Nominating and Governance Committee and as a member of the Finance Committee and the Sustainability, Innovation and Policy Committee. As of February 1, 2024, Defendant Kennard beneficially owned 210,127 shares of the Company's common stock. At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant Kennard owned approximately $2.5 million worth of Ford common stock as of that date.

38.     Defendant Kennard's compensation from the Company for the 2021 Fiscal Year was $394,075, which was made up of $120,000 in fees earned or paid in

cash, $214,990 in stock awards, and $59,085 in all other compensation. Defendant Kennard's compensation for the 2022 Fiscal Year was $394,772, which was made up of $120,000 in fees earned or paid in cash, $214,993 in stock awards, and $59,778 in all other compensation. Defendant Kennard's compensation for the 2023 Fiscal Year was $397,947, which was made up of $120,000 in fees earned or paid in cash, $214,991 in stock awards, and $62,956 in all other compensation.

**Defendant May**

39.     Defendant John C. May ("May") has served as a Ford director since 2021. He also serves as a member of the Compensation, Talent and Culture Committee and the Nominating and Governance Committee. As of February 1, 2024, Defendant May beneficially owned 56,883 shares of the Company's common stock. At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant May owned approximately $688,284 worth of Ford common stock as of that date.

40.     Defendant May's compensation from the Company for the 2021 Fiscal Year was $26,258, which was made up of $8,333 in fees earned or paid in cash, $17,904 in stock awards, and $21 in all other compensation. Defendant May's compensation from the Company for the 2022 Fiscal Year was $317,039, which was made up of $100,000 in fees earned or paid in cash, $214,993 in stock awards, and $2,046 in all other compensation. Defendant May's compensation from the

Company for the 2023 Fiscal Year was $348,504, which was made up of $314,990 in stock awards and $33,514 in all other compensation.

**Defendant Mooney**

41.    Defendant Beth E. Mooney ("Mooney") has served as a Ford director since 2019. Defendant Mooney also serves as a member of the Audit Committee and the Nominating and Governance Committee. As of February 1, 2024, Defendant Mooney beneficially owned 115,830 shares of the Company's common stock. At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant Mooney owned approximately $1.4 million worth of Ford common stock as of that date.

42.    Defendant Mooney's compensation from the Company for the 2021 Fiscal Year was $351,344, which was made up of $100,000 in fees earned or paid in cash, $214,990 in stock awards, and $36,354 in all other compensation. Defendant Mooney's compensation from the Company for the 2022 Fiscal Year was $352,138, which was made up of $100,000 in fees earned or paid in cash, $214,993 in stock awards, and $37,144 in all other compensation. Defendant Mooney's compensation from the Company for the 2023 Fiscal Year was $353,342, which was made up of $100,000 in fees earned or paid in cash, $214,991 in stock awards, and $38,352 in all other compensation.

**Defendant Vojvodich Radakovich**

43.     Defendant Lynn Vojvodich Radakovich ("Vojvodich Radakovich") has served as a Ford director since 2017. She also serves as the Chair of the Compensation, Talent and Culture Committee and as a member of the Nominating and Governance Committee and the Sustainability, Innovation and Policy Committee. As of February 1, 2024, Defendant Vojvodich Radakovich beneficially owned 171,531 shares of the Company's common stock. At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant Vojvodich Radakovich owned approximately $2.1 million worth of Ford common stock as of that date.

44.     Defendant Vojvodich Radakovich's compensation from the Company for the 2021 Fiscal Year was $386,906, which was made up of $100,000 in fees earned or paid in cash, $214,990 in stock awards, and $71,916 in all other compensation. Defendant Vojvodich Radakovich's compensation from the Company for the 2022 Fiscal Year was $406,964, which was made up of $114,583 in fees earned or paid in cash, $214,993 in stock awards, and $77,388 in all other compensation. Defendant Vojvodich Radakovich's compensation from the Company for the 2023 Fiscal Year was $420,016, which was made up of $125,000 in fees earned or paid in cash, $214,991 in stock awards, and $80,025 in all other compensation.

**Defendant Thornton**

45. Defendant John L. Thornton ("Thornton") has served as a Ford director since 1996 and as the Company's Lead Independent Director since 2022. Defendant Thornton also serves as a member of the Compensation, Talent and Culture Committee, Finance Committee, and the Nominating and Governance Committee. As of February 1, 2024, Defendant Thornton beneficially owned 340,298 shares of the Company's common stock and 380,182 shares of Ford common stock units. At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant Thornton owned approximately $4.1 million worth of Ford common stock as of that date.

46. Defendant Thornton's compensation from the Company for the 2021 Fiscal Year was $339,365, which was made up of $100,000 in fees earned or paid in cash, $214,990 in stock awards, and $24,375 in all other compensation. Defendant Thornton's compensation from the Company for the 2022 Fiscal Year was $367,473, which was made up of $129,167 in fees earned or paid in cash, $214,993 in stock awards, and $23,313 in all other compensation. Defendant Thornton's compensation from the Company for the 2023 Fiscal Year was $388,960, which was made up of $150,000 in fees earned or paid in cash, $214,991 in stock awards, and $23,969 in all other compensation.

**Defendant Veihmeyer**

47. Defendant John B. Veihmeyer ("Veihmeyer") has served as a Ford

director since 2017. Defendant Veihmeyer also serves as the Chair of the Audit Committee and as a member of the Nominating and Governance Committee. As of February 1, 2024, Defendant Veihmeyer beneficially owned 216,943 shares of the Company's common stock. At the close of trading on February 1, 2024, Ford's stock price was $12.10 per share, thus, Defendant Veihmeyer owned approximately $3.2 million worth of Ford common stock as of that date.

48.     Defendant Veihmeyer's compensation from the Company for the 2021 Fiscal Year was $406,597, which was made up of $130,000 in fees earned or paid in cash, $214,990 in stock awards, and $61,607 in all other compensation. Defendant Veihmeyer's compensation from the Company for the 2022 Fiscal Year was $407,998, which was made up of $130,000 in fees earned or paid in cash, $214,993 in stock awards, and $63,004 in all other compensation. Defendant Veihmeyer's compensation from the Company for the 2023 Fiscal Year was $409,832, which was made up of $344,998 in stock awards and $64,834 in all other compensation.

**Defendant Weinberg**

49.     Defendant John S. Weinberg ("Weinberg") has served as a Ford director since 2016. Defendant Weinberg also serves as a member of the Compensation, Talent and Culture Committee, the Nominating and Governance Committee, and the Sustainability, Innovation and Policy Committee. As of February 1, 2024, Defendant Weinberg beneficially owned 261,661 shares of the

Company's common stock. At the close of trading on February 1, 2024, Ford's stock price was $12.10, thus, Defendant Weinberg owned approximately $3.2 million worth of Ford common stock as of that date.

50.  Defendant Weinberg's compensation from the Company for the 2021 Fiscal Year was $349,371, which was made up of $100,000 in fees earned or paid in cash, $214,990 in stock awards, and $61,607 in all other compensation. Defendant Weinberg's compensation from the Company for the 2022 Fiscal Year was $350,038, which was made up of $100,000 in fees earned or paid in cash, $214,993 in stock awards, and $35,045 in all other compensation. Defendant Weinberg's compensation from the Company for the 2023 Fiscal Year was $350,394, which was made up of $314,990 in stock awards and $35,404 in all other compensation.

## **THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

51.  Ford is a company that designs, produces, and distributes its automobiles such as trucks, SUVs, and commercial vehicles under the Ford and Lincoln brandings. The Company's business model is made up of three segments: Ford Blue, which provides gas-powered and hybrid vehicles; Ford Model e, which develops electric vehicles; and Ford Pro, which suits vehicles and services towards customer needs.

52.  The Company offers a warranty on every vehicle it sells. The

warranties vary based on the type of product sold, as well as the geographic area where the product is sold. Should a vehicle experience some kind of issue due to a factory-supplied defective part or workmanship during the warranty period, Ford will repair, replace, or adjust parts of the vehicle.

**False and Misleading Statements**

***October 28, 2021 10-Q***

53.     On October 28, 2021, Ford filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2021 ("3Q21") (the "3Q21 10-Q"). The 3Q21 10-Q reported Ford's financial results, which included 3Q21 revenue of $35.7 billion and 3Q21 net income of $1.8 billion, and increased warranty costs. In particular, the Company provided an "estimate of reasonably possible costs in excess of [] accruals for material field service actions and customer satisfaction actions" in a "***range of up to about $900 million in the aggregate***," and stated the following, in relevant part:

|  | First Nine Months | |
|---|---|---|
|  | 2020 | 2021 |
| Beginning balance | $ 5,702 | $ 8,172 |
| Payments made during the period | (2,913) | (3,109) |
| Changes in accrual related to warranties issued during the period | 2,419 | 2,819 |
| Changes in accrual related to pre-existing warranties | 1,451 | 44 |
| Foreign currency translation and other | (75) | (77) |
| Ending balance | $ 6,584 | $ 7,849 |

***February 3, 2022 Press Release***

54.     On February 3, 2022, the Company issued a press release announcing

23

its financial results for the fourth quarter ("4Q21") and full 2021 Fiscal Year (the "FY21 Release"). In the FY21 Release, Ford reported 4Q21 revenue of $17.9 billion, 4Q21 net income of $12.3 billion, full 2021 Fiscal Year revenue of $136.3 billion, and full 2021 Fiscal Year net income of $17.9 billion.

### *February 4, 2022 10-K*

55.    On February 4, 2022, Ford filed its annual report on Form 10-K with the SEC for the 2021 Fiscal Year (the "2021 10-K"), which was signed by Defendants W. Ford, Farley, Casiano, English, H. Ford, Helman, Kennard, May, Mooney, Radakovich, Thornton, Veihmeyer, Weinberg, and Lawler and contained a series of materially false and misleading statements. The 2021 10-K affirmed the financial results reported in the FY21 Release and reported increased warranty costs. In particular, the Company provided an "estimate of reasonably possible costs in excess of [] accruals for material field service actions and customer satisfaction actions" in a "***range of up to about $1 billion in the aggregate***." In relevant part, the 2021 10-K stated:

| | 2020 | 2021 |
|---|---|---|
| Beginning balance | $    5,702 | $    8,172 |
| Payments made during the period | (3,923) | (3,952) |
| Changes in accrual related to warranties issued during the period | 3,934 | 4,102 |
| Changes in accrual related to pre-existing warranties | 2,403 | 221 |
| Foreign currency translation and other | 56 | (92) |
| Ending balance | $    8,172 | $    8,451 |

### *April 27, 2022 Press Release*

56.    On April 27, 2022, Ford published a press release announcing its

financial results for the first quarter of the 2022 Fiscal Year (the "1Q22 Press Release"). The 1Q22 Press Release represented, *inter alia*, that the Company's revenue for the quarter was $34.5 billion, while also reporting a net loss of $3.1 billion.

### *April 28, 2022 10-Q*

57.     On April 28, 2022, Ford filed the 1Q22 10-Q with the SEC. The 1Q22 10-Q was signed by Defendants Farley and Lawler. In addition, the 1Q22 10-Q attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Farley and Lawler attesting to its accuracy and representing that the "information included in this [1Q22 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

58.     The 1Q22 10-Q affirmed the 1Q22 Press Release's financial results.

59.     The 1Q22 10-Q also reported on Ford's estimated warranty and field service action costs. The 1Q22 10-Q reported an increase to the Company's estimated warranty costs, stating:

| | First Quarter | |
| | 2021 | 2022 |
|---|---|---|
| Beginning balance | $ 8,172 | $ 8,451 |
| Payments made during the period | (1,086) | (984) |
| Changes in accrual related to warranties issued during the period | 1,000 | 793 |
| Changes in accrual related to pre-existing warranties | (141) | 21 |
| Foreign currency translation and other | (40) | 38 |
| Ending balance | $ 7,905 | $ 8,319 |

The 1Q22 10-Q further stated that the "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a *range of up to about $700 million in the aggregate*."

### July 27, 2022 Press Release

60.    On July 27, 2022, Ford published a press release announcing its financial results for the second quarter of the 2022 Fiscal Year (the "2Q22 Press Release"). The 2Q22 Press Release represented that Ford's revenue for the quarter was $40.2 billion, while also reporting a net income of $0.7 billion.

### July 28, 2022 10-Q

61.    The following day, Ford filed its quarterly report on Form 10-Q for the second quarter of the 2022 Fiscal Year with the SEC (the "2Q22 10-Q"), which was signed by Defendants Farley and Lawler. The 2Q22 10-Q also included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and that the "information included in this [2Q22 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the

26

[Company]."

62.    The 2Q22 10-Q affirmed the 2Q22 Press Release's financial results.

63.    The 2Q22 10-Q also made representations regarding the Company's estimated warranty and field service action costs, stating the following, in relevant part:

| | First Half | |
| | 2021 | 2022 |
|---|---|---|
| Beginning balance | $ 8,172 | $ 8,451 |
| Payments made during the period | (2,169) | (2,006) |
| Changes in accrual related to warranties issued during the period | 1,933 | 1,877 |
| Changes in accrual related to pre-existing warranties | 80 | 395 |
| Foreign currency translation and other | (5) | (120) |
| Ending balance | $ 8,011 | $ 8,597 |

The 2Q22 10-Q also reported that an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a *range of up to about $700 million in the aggregate*."

### *October 26, 2022 Press Release*

64.    On October 26, 2022, Ford published a press release announcing its financial results for the third quarter of the 2022 Fiscal Year (the "3Q22 Press Release"). The 3Q22 Press Release represented, among other things, that the Company's revenue for the quarter was $39.4 billion, while also reporting a net loss of $0.8 billion.

### *October 27, 2022 10-Q*

65.     On October 27, 2022, Ford filed its quarterly report on Form 10-Q for the third quarter of the 2022 Fiscal Year with the SEC (the "3Q22 10-Q"), which was signed by Defendants Farley and Lawler. The 3Q22 10-Q also included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and representing that the "information included in this [3Q22 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

66.     The 3Q22 10-Q affirmed the 3Q22 Press Release's financial results.

67.     The 3Q22 10-Q also discussed Ford's estimated warranty and field service action costs. In reporting an increase to the estimated warranty costs, the 3Q22 10-Q stated:

|  | First Nine Months | | | |
|  | 2021 | | 2022 | |
| Beginning balance | $ | 8,172 | $ | 8,451 |
| Payments made during the period | | (3,109) | | (3,063) |
| Changes in accrual related to warranties issued during the period | | 2,819 | | 2,806 |
| Changes in accrual related to pre-existing warranties | | 44 | | 449 |
| Foreign currency translation and other | | (77) | | (241) |
| Ending balance | $ | 7,849 | $ | 8,402 |

The 3Q22 10-Q reported that an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a *range of up to about $700 million in the aggregate*."

**February 2, 2023 Press Release**

68.     On February 2, 2023, Ford published a press release to disclose its

28

financial results for the fourth quarter and full 2022 Fiscal Year (the "FY22 Press Release"). The FY22 Press Release represented, *inter alia*, that Ford's revenue for the fourth quarter was $44 billion. In addition, it reported a net income of $1.3 billion.

69.     The FY22 Press Release also disclosed a full year revenue of $158.1 billion, with a full year net loss of $2 billion.

### *February 3, 2023 10-K*

70.     On February 3, 2023, Ford filed its annual report on Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 10-K"), which was signed by Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, Weinberg, and Lawler. In addition, the 2022 10-K included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and representing that the "information included in this [2022 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

71.     The 2022 10-K affirmed the FY22 Press Release's financial results.

72.     The 2022 10-K also discussed Ford's estimated warranty and field service action costs. In reporting an increase to the estimated warranty costs, the 2022 10-K stated:

| | 2021 | 2022 |
|---|---|---|
| Beginning balance | $ 8,172 | $ 8,451 |
| Payments made during the period | (3,952) | (4,166) |
| Changes in accrual related to warranties issued during the period | 4,102 | 4,028 |
| Changes in accrual related to pre-existing warranties | 221 | 1,134 |
| Foreign currency translation and other | (92) | (254) |
| Ending balance | $ 8,451 | $ 9,193 |

The 2022 10-K reported that an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a *range of up to about $700 million in the aggregate*."

### March 31, 2023 Proxy Statement

73.    On March 31, 2023, Ford filed a Schedule 14A with the SEC pursuant to Section 14(a) of the Exchange Act (the "2023 Proxy Statement"), which was solicited by Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg and contained material misstatements and omissions.

74.    The 2023 Proxy Statement solicited the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board; (2) ratify the selection of PricewaterhouseCoopers LLP as Ford's independent registered public accounting firm for the 2023 Fiscal Year; (3) approve, on an advisory basis, the compensation of Ford's named executive officers; (4) approve, on an advisory basis, the frequency of future shareholder votes on the compensation of Ford's named executive officers;

and (5) approve the 2023 LTIP. The 2023 Proxy Statement disclosed that the prior effective Long Term Incentive Plan (from 2018) was set to expire on May 1, 2023.

75.    The 2023 Proxy Statement stated that if Company shareholders approved the 2023 LTIP, "awards of shares of common stock, PSUs, RSUs, stock options, and various other rights relating to common stock (collectively, "Plan Awards") may be granted to officers and other key employees, consultants, and advisors who are designated by the [Compensation, Talent and Culture] Committee to participate in the 2023 Plan." Further, the 2023 Proxy Statement represented that "[e]mployees (including executive officers and directors who are also the Company's employees, if any) and consultants and advisors to the Company and its subsidiaries are eligible to participate in the 2023 Plan."

76.    Three of the Individual Defendants received lucrative compensation, while numerous of them made false and misleading statements, during and after the solicitation of the 2023 Proxy Statement. Notably, shareholders would not have approved the proposals in the 2023 Proxy Statement, and thus, the 2023 LTIP, had they known the truth about the Company. In total, the amounts received pursuant to the 2023 LTIP were: (1) 509,890 shares of restricted stock units ("RSUs") by Defendant Farley on March 4, 2024; (2) 135,635 shares of RSUs by Defendant Lawler on March 4, 2024; and (3) 397,488 shares of RSUs by Defendant W. Ford on March 4, 2024.

77.     In a section titled "The Board's Role in Risk Management," the 2023

Proxy Statement stated:

The oversight responsibility of the Board and its committees is supported by Company management and the risk management processes that are currently in place. Ford has extensive and effective risk management processes, relating specifically to compliance, reporting, operating, and strategic risks.

- *Compliance Risk* encompasses matters such as legal and regulatory compliance (e.g., Foreign Corrupt Practices Act, environmental, OSHA/safety, etc.).

- *Reporting Risk* covers Sarbanes-Oxley compliance, disclosure controls and procedures, and accounting compliance.

- *Operating Risk* addresses the myriad of matters related to the operation of a complex company such as Ford (e.g., quality, supply chain, sales and service, financing and liquidity, product development and engineering, labor, etc.).

- *Strategic Risk* encompasses somewhat broader and longer-term matters, including, but not limited to, technology development, environmental and social sustainability, capital allocation, management development, retention and compensation, competitive developments, and geopolitical developments.

We believe that key success factors in risk management at Ford include a strong risk analysis tone set by the Board and senior management, which is shown through their commitment to effective top-down and bottom-up communication (including communication between management and the Board and Committees), and active cross-functional participation among the Business Segments and Skill Teams. We have institutionalized a regular Forecast, Controls and Risk Review and Special Attention Review process where the senior leadership of the Company reviews the status of the business, the risks and

opportunities presented to the business (in the areas of compliance, reporting, operating, and strategic risks), and develops specific plans to address those risks and opportunities.

The Enterprise Risk Management process adopted by the Company identifies the top critical enterprise risks through a survey process of senior management and the Board of Directors. Once identified, each of the top risks is assigned an executive risk owner who is responsible to oversee risk assessment, develop mitigation plans, and provide regular updates. The Enterprise Risk Management process also engages Business Segments and Skill Teams to determine which of the enterprise risks are most relevant to their specific objectives, and identify any additional risks that can be managed at a lower level in the organization. All identified Enterprise Critical Risks are evaluated for their exposure to related geopolitical risk and climate change impacts. The Audit Committee and Board annually review the process to update the list of critical risks and monitor risk movement and emerging trends, and the Enterprise Risk Management team also reviews the annual survey results with outside advisors to ensure the Company assessment is up to date with external risk developments.

As noted above, the full Board of Directors has overall responsibility for the oversight of risk management at Ford and oversees operating risk management with reviews at each of its regular Board meetings. The Board of Directors has delegated responsibility for the oversight of specific areas of risk management to certain committees of the Board, with each Board committee reporting to the full Board following each committee meeting. The Audit Committee assists the Board of Directors in overseeing compliance and reporting risk, and the Enterprise Risk Management process itself. The Sustainability, Innovation and Policy Committee assists the Board of Directors in overseeing environmental and social sustainability risks, while the Compensation, Talent and Culture Committee assists the Board of Directors in overseeing risks related to compensation and people- related business strategies, including leadership succession and culture, diversity, and inclusion. The Board and the appropriate committees also periodically review other policies related to personnel matters, including those related to sexual harassment and anti-retaliation policies related to whistleblowers. The Board, the Sustainability, Innovation and Policy Committee, the Compensation,

Talent and Culture Committee, the Finance Committee, and the Audit Committee all play a role in overseeing operating and strategic risk management.

The scope and severity of risks presented by cyber threats have increased dramatically, and constant vigilance is required to protect against intrusions. We take cyber threats very seriously and regularly audit our cyber security capabilities. These audits are a useful tool for ensuring that we maintain a robust cyber security program to protect our investors, customers, employees, and intellectual property. The Audit Committee receives updates several times per year from the Chief Information Security Officer regarding technology and cyber security risk and conducts regular reviews of our cyber security practices, with report outs to the Board as appropriate. As part of its risk assessment procedures, the Board reviews relevant cyber security and information technology matters at least twice annually.

We also maintain an industry-leading cyber security insurance program with many of the world's largest and most respected insurance companies. Additionally, we are a founding member of the Board of the Automotive Information Sharing and Analysis Center. Our current seat on that board ensures that we preserve relationships that help to protect ourselves against both enterprise and in-vehicle security risks.

78. With respect to the Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel, the 2023 Proxy Statement stated:

Ford is committed to operating its business with the highest level of integrity. The Company has published on its website (www.corporate.ford.com) its Code of Conduct, which all officers and employees are required to follow. These expectations are reinforced in mandatory online training courses for all Ford salaried full-time, part-time, and agency workers, including an annual Code of Conduct course. These courses are periodically refreshed and reviewed to ensure the content remains relevant and appropriate. In addition, the Company has adopted, and published on its website, codes of ethics that apply to all directors and senior financial personnel, including the chief executive officer. Any waiver of, or amendments to, the codes of ethics for directors or executive officers, including the chief executive officer, the

34

chief financial officer, and the principal accounting officer, must be approved by the Nominating and Governance Committee, and any such waivers or amendments will be disclosed promptly by the Company by posting such waivers or amendments to its website. Both the Audit Committee and the Nominating and Governance Committee review management's monitoring of compliance with the Company's Code of Conduct. Printed copies of each of the codes of ethics referred to above are also available by writing to our Shareholder Relations Department at Ford Motor Company, Shareholder Relations, P.O. Box 6248, Dearborn, MI 48126.

79.     Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's quality assurance procedures for its vehicles had been deficient since the start of the Relevant Period; (2) as such, Ford had begun to experience higher warranty costs; (3) due to the foregoing, Ford's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) Ford's profitability was therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval the 2023 LTIP and the 2024 Stock Plan; and (6) the Company failed to maintain internal controls.

80.     The 2023 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel were

not followed, as evidenced by the Individual Defendants (1) making and/or causing Ford to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct, Director Code of Ethics, or the Code of Ethics for Senior Financial Personnel.

81.     As a result of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (3) approve named executive officer compensation on an advisory, non-binding basis; (4) approve the frequency of future votes on Ford's named executive officer compensation; and (5) approve the 2023 LTIP.

82.     Because shareholders voted to approve the 2023 LTIP, there was a new plan in place upon the expiration of the preexisting plan. Three Individual Defendants, two of whom are current Ford directors, received material personal benefits that they otherwise would not have received but for the issuance of the false

and misleading 2023 Proxy Statement and the shareholders approving the 2023 LTIP. In addition, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2023 LTIP in the future.

### *May 2, 2023 Press Release*

83.     On May 2, 2023, Ford published a press release disclosing its financial results for the first quarter of the 2023 Fiscal Year (the "1Q23 Press Release"). The 1Q23 Press Release reported, among other things, that the Company's revenue for the first quarter was $41.5 billion, while also reporting a net income of $1.8 billion.

### *May 3, 2023 10-Q*

84.     On May 3, 2023, Ford filed its quarterly report on Form 10-Q with the SEC for the first quarter of the 2023 Fiscal Year (the "1Q23 10-Q"), which was signed by Defendants Farley and Lawler. The 1Q23 10-Q also included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and representing that the "information included in this [1Q23 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

85.     The 1Q23 10-Q affirmed the 1Q23 Press Release's financial results.

86.     The 1Q23 10-Q also reported on the Company's estimated warranty and field service action costs, stating:

| | | First Quarter | | |
| | | 2022 | | 2023 |
|---|---|---|---|---|
| Beginning balance | $ | 8,451 | $ | 9,193 |
| Payments made during the period | | (984) | | (990) |
| Changes in accrual related to warranties issued during the period | | 793 | | 972 |
| Changes in accrual related to pre-existing warranties | | 21 | | 226 |
| Foreign currency translation and other | | 38 | | (117) |
| Ending balance | $ | 8,319 | $ | 9,284 |

The 1Q23 10-Q reported that an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a **_range of up to about $700 million in the aggregate_**."

**_July 27, 2023 Press Release_**

87.     On July 27, 2023, Ford published a press release disclosing its financial results for the second quarter of the 2023 Fiscal Year (the "2Q23 Press Release"). The 2Q23 Press Release reported, among other things, that the Company had second quarter revenue of $45 billion, while also reporting a net income of $1.9 billion.

**_July 28, 2023 10-Q_**

88.     On July 28, 2023, Ford filed its quarterly report on Form 10-Q with the SEC for the second quarter of the 2023 Fiscal Year (the "2Q23 10-Q"), which was signed by Defendants Farley and Lawler. The 2Q23 10-Q also included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and

representing that the "information included in this [2Q23 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

89.     The 2Q23 10-Q affirmed the 2Q23 Press Release's financial results.

90.     The 2Q23 10-Q also reported on Ford's estimated warranty and field service action costs. In reporting an increase to the estimated warranty costs, the 2Q23 10-Q stated:

|  | First Half | |
|---|---|---|
|  | 2022 | 2023 |
| Beginning balance | $  8,451 | $  9,193 |
| Payments made during the period | (2,006) | (2,011) |
| Changes in accrual related to warranties issued during the period | 1,877 | 2,146 |
| Changes in accrual related to pre-existing warranties | 395 | 882 |
| Foreign currency translation and other | (120) | (314) |
| Ending balance | $  8,597 | $  9,896 |

The 2Q23 10-Q reported that an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a *range of up to about $1 billion in the aggregate*."

### *October 26, 2023 Press Release*

91.     On October 26, 2023, Ford published a press release announcing its financial results for the third quarter of the 2023 Fiscal Year (the "3Q23 Press Release"). The 3Q23 Press Release disclosed, among other things, that the Company's revenue for the third quarter was $43.8 billion, while also reporting a net income of $1.2 billion.

92.    The 3Q23 Press Release further revealed that Ford was "Changing How it Works to Improve Quality, Costs." With respect to quality assurance, the 3Q23 Press Release announced, *inter alia*, that "Ford's third-quarter 2023 results illustrated how the company is beginning to fulfill the growth potential of the customer-focused Ford+ plan – and ***underscored the vital role of higher quality and lower costs in driving profitability***."

93.    In addition, the 3Q23 Press Release quoted Defendant Farley, who represented that he was "very optimistic about the reality we're creating with Ford+." Defendant Farley also stated the following, in relevant part:

> We're building a more dynamic, highly talented and customer-focused company at the intersection of great vehicles, iconic brands, innovative software and high-value services. . . We're also radically changing how we work with a series of actions that put the right people with the right capabilities in the right places across the organization, so that ***our promise isn't masked by cost and quality issues***.

94.    With respect to Ford's approach for following through on these promises, the 3Q23 stated:

> ***To attack quality and cost issues, Ford last week completed a sequence of organizational changes in support of Ford+, creating an end-to-end global industrial system*** under Kumar Galhotra, who was named chief operating officer.
>
> The system – comprising vehicle engineering and cycle planning, gas and hybrid programs, supply chain management, and manufacturing – is expected to be an effective and efficient operational engine for all three auto business segments: Ford Blue, Ford Model e and Ford Pro.

Farley said that Galhotra's organization together with Doug Field's EVs, Digital and Design team "will support the businesses and their customers with great technologies and products, ***while raising quality, reducing costs and rooting out waste with a vengeance***."

***October 26, 2023 10-Q***

95.     Also on October 26, 2023, Ford filed its quarterly report on Form 10-Q with the SEC for the third quarter of the 2023 Fiscal Year (the "3Q23 10-Q"), which was signed by Defendants Farley and Lawler. The 3Q23 10-Q also included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and representing that the "information included in this [3Q23 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

96.     The 3Q23 10-Q affirmed the 3Q23 Press Release's financial results.

97.     The 3Q23 10-Q also reported on Ford's estimated warranty and field service action costs, stating:

| | First Nine Months | |
| --- | --- | --- |
| | 2022 | 2023 |
| Beginning balance | $   8,451 | $   9,193 |
| Payments made during the period | (3,063) | (3,481) |
| Changes in accrual related to warranties issued during the period | 2,806 | 3,331 |
| Changes in accrual related to pre-existing warranties | 449 | 2,016 |
| Foreign currency translation and other | (241) | (274) |
| Ending balance | $   8,402 | $   10,785 |

The 3Q23 10-Q reported that an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a ***range of up to about $1.5 billion in the aggregate***."

***February 6, 2024 Press Release***

98.     On February 6, 2024, the Company issued a press release announcing its financial results for the fourth quarter and full 2023 Fiscal Year (the "FY23 Press Release"). The FY23 Press Release disclosed, among other things, that the Company's revenue for the fourth quarter was $46 billion, while also reporting a net loss of $0.5 billion.

99.     In addition, the FY23 Press Release announced a full year revenue of $176.2 billion for the 2023 Fiscal Year, while also reporting a net income of $4.3 billion.

100.    In a section titled "Outlook for Healthy '24," the FY23 Press Release stated the following, in relevant part:

> The company's ***total costs are expected to be flat year-over-year***, the net of factors including the $2 billion in industrial cost improvements, offset by higher expenses for labor and major product-refresh actions.

> At a segment level, the outlook is for full-year 2024 EBIT of at least $8 billion to $9 billion from Ford Pro and about $7 billion to $7.5 billion from Ford Blue; an EBIT loss of $5.0 billion to $5.5 billion for Ford Model e; and earnings before taxes of about $1.5 billion from Ford Credit.

***February 7, 2024 10-K***

101.    On February 7, 2024, Ford filed its annual report on Form 10-K for the 2023 Fiscal Year with the SEC (the "2023 10-K"), which was signed by Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May,

Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, Weinberg, and Lawler. In addition, the 2023 10-K included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and representing that the "information included in this [2023 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

102.    The 2023 10-K affirmed the FY23 Press Release's financial results.

103.    In addition, the 2023 10-K reported on Ford's estimated warranty and field service action costs, stating:

| | 2022 | 2023 |
|---|---|---|
| Beginning balance | $ 8,451 | $ 9,193 |
| Payments made during the period | (4,166) | (4,779) |
| Changes in accrual related to warranties issued during the period | 4,028 | 4,743 |
| Changes in accrual related to pre-existing warranties | 1,134 | 2,648 |
| Foreign currency translation and other | (254) | (301) |
| Ending balance | $ 9,193 | $ 11,504 |

The 2023 10-K reported that an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a ***range of up to about $1.3 billion in the aggregate***."

***March 29, 2024 Proxy Statement***

104.    On March 29, 2024, Ford filed the 2024 Proxy Statement with the SEC, which was solicited by Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg. The 2024 Proxy Statement was solicited pursuant to Section 14(a) of

the Exchange Act and contained material misstatements and omissions.

105. The 2024 Proxy Statement solicited Ford's shareholders to vote to, *inter alia*: (1) re-elect Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve, on an advisory basis, the compensation of Ford's named executive officers; and (4) approve the 2024 Stock Plan. The 2024 Proxy Statement disclosed that the prior effective plan (the 2014 Stock Plan for Non-Employee Directors) expired on December 31, 2023 and that the 2024 Stock Plan became effective January 1, 2024, subject to stockholder approval.

106. With respect to the 2024 Stock Plan, the 2024 Proxy Statement represented that if the Company's shareholders approved the 2024 Stock Plan, the amount "available for the granting of Awards for the ten-year term of the 2024 Plan [would be] 10 million shares (the "Limit")." The 2024 Proxy Statement also stated that approval of the 2024 Stock Plan "awards of [Restricted Stock Units (RSUs)][3], restricted stock, stock options, and stock appreciation rights (collectively, "Awards")

---

[3] The 2024 Proxy Statement stated: "An RSU is the right to receive up to the number of Shares described therein. . . Awards of RSUs vest immediately, and each Eligible Director chooses when such RSUs settle into Shares from the following options: (i) immediately upon grant; (ii) the earlier of five years from the Grant Date and separation from the Board; and (iii) separation from the Board."

may be granted to non-employee Directors ("Eligible Directors") of the Company."

Notably, the 2024 Stock Plan *requires* at least 68% of a director's annual Board fees

be paid in RSUs.

107.    Several of the Individual Defendants received handsome

compensation pursuant to the 2024 Stock Plan, while numerous of them made false

and misleading statements, during and after the solicitation of the 2024 Proxy

Statement. In total, the amounts received under the 2024 Stock Plan were as follows:

(1) for Defendant Veihmeyer, 27,867 Company stock units on May 16, 2024 worth

approximately $344,994; (2) for Defendants Casiano, H. Ford, Helman, Kennard,

Mooney, Thornton,  and Vojvodich Radakovich, 17,366 shares of Company stock

units each on May 16, 2024 worth approximately $214,991; and (3) for Defendants

English, May, and Weinberg, 25,444 shares of Company stock units each on May

16, 2024 worth approximately $314,997.[4]

108.    Under a section titled "The Board's Role in Risk Oversight," the 2024

Proxy Statement stated:

> The oversight responsibility of the Board and its committees is
> supported by Company management and the risk management
> processes that are currently in place. Ford has extensive and effective
> risk management processes, relating specifically to compliance,
> reporting, operating, and strategic risks.
>
> - *Compliance Risk* encompasses matters such as legal and
>   regulatory compliance (e.g., Foreign Corrupt Practices Act,

---

[4] These amounts are represented in Form 4s filed with the SEC on May 17, 2024.

environmental, Occupational Safety and Health Administration/safety, etc.).

- *Reporting Risk* covers Sarbanes-Oxley compliance, disclosure controls and procedures, and accounting compliance.

- *Operating Risk* addresses the myriad of matters related to the operation of a complex company such as Ford (e.g., quality, supply chain, sales and service, financing and liquidity, product development and engineering, labor, etc.).

- *Strategic Risk* encompasses somewhat broader and longer-term matters, including, but not limited to, technology development, environmental and social sustainability, capital allocation, management development, retention and compensation, competitive developments, and geopolitical developments.

We believe that key success factors in risk management at Ford include a strong risk analysis tone set by the Board and senior management, which is shown through their commitment to effective top-down and bottom-up communication (including communication between management and the Board and Committees), and active cross-functional participation among the Business Segments and Skill Teams. We have institutionalized a regular Forecast, Controls and Risk Review and Special Attention Review process where the senior leadership of the Company reviews the status of the business, the risks and opportunities presented to the business (in the areas of compliance, reporting, operating, and strategic risks), and develops specific plans to address those risks and opportunities.

The Enterprise Risk Management process adopted by the Company identifies the top critical enterprise risks through engagement with senior management and the Board of Directors. Once identified, each of the top risks is validated and assigned an executive risk owner who is responsible to oversee risk assessment, develop mitigation plans, and provide regular updates. The Enterprise Risk Management process also engages Business Segments and Skill Teams to determine which of the enterprise risks are most relevant to their specific objectives, and identify any additional risks that can be managed at a lower level in the

organization. All identified Enterprise Critical Risks are evaluated for their exposure to related geopolitical risk and climate change impacts. The Audit Committee and Board annually review the process to update the list of critical risks and monitor risk movement and emerging trends, and the Enterprise Risk Management team also benchmarks the annual risk assessment with outside sources to ensure the Company assessment is up to date with external risk developments.

As noted above, the full Board of Directors has overall responsibility for the oversight of risk management at Ford and oversees operating risk management with reviews at each of its regular Board meetings. The Board of Directors has delegated responsibility for the oversight of specific areas of risk management to certain committees of the Board, with each Board committee reporting to the full Board following each committee meeting. The Audit Committee assists the Board of Directors in overseeing compliance and reporting risk, cybersecurity risk, and the Enterprise Risk Management process itself. The Sustainability, Innovation and Policy Committee assists the Board of Directors in overseeing environmental and social sustainability risks, while the Compensation, Talent and Culture Committee assists the Board of Directors in overseeing risks related to compensation and people-related business strategies, including leadership succession and culture, diversity, and inclusion. The Board and the appropriate committees also periodically review other policies related to personnel matters, including those related to sexual harassment and anti-retaliation policies related to whistleblowers. The Board, the Sustainability, Innovation and Policy Committee, the Compensation, Talent and Culture Committee, the Finance Committee, and the Audit Committee all play a role in overseeing operating and strategic risk management.

The scope and severity of cybersecurity risks is evolving, and we devote significant resources to our security program that we believe is reasonably designed to protect against these risks. The Audit Committee receives regular updates on our cybersecurity practices as well as cybersecurity and information technology risks from our Chief Information Security Officer. These regular updates include topics related to cybersecurity practices, cyber risks, and risk management processes, such as updates to our cybersecurity programs and mitigation strategies, and other cybersecurity developments. In addition

to these regular updates, as part of our incident response processes, the Chief Enterprise Technology Officer, in collaboration with the Chief Information Security Officer and General Counsel, provides updates on certain cybersecurity incidents to the Audit Committee and, in some cases, the Board. The Audit Committee reviews and provides input into and oversight of our cybersecurity processes, and in the event Ford determines it has experienced a material cybersecurity incident, the Audit Committee is notified about the incident in advance of filing a Current Report on Form 8-K. See our Annual Report on Form 10-K for the year ended December 31, 2023 for additional discussion regarding our cybersecurity risk management, strategy, and governance.

109. With respect to the Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel, the 2024 Proxy Statement stated the following, in relevant part:

Ford is committed to operating its business with the highest level of integrity. The Company has published on its website (www.corporate.ford.com) its Code of Conduct, which all officers and employees are required to follow. These expectations are reinforced in mandatory online training courses for all Ford salaried full-time, part-time, and agency workers, including an annual Code of Conduct course. These courses are periodically refreshed and reviewed to ensure the content remains relevant and appropriate. In addition, the Company has adopted, and published on its website, codes of ethics that apply to all directors and senior financial personnel, including the chief executive officer. Any waiver of, or amendments to, the codes of ethics for directors or executive officers, including the chief executive officer, the chief financial officer, and the principal accounting officer, must be approved by the Nominating and Governance Committee, and any such waivers or amendments will be disclosed promptly by the Company by posting such waivers or amendments to its website. Both the Audit Committee and the Nominating and Governance Committee review management's monitoring of compliance with the Company's Code of Conduct. Printed copies of each of the codes of ethics referred to above are also available by writing to our Shareholder Relations Department at Ford Motor Company, Shareholder Relations, P.O. Box 6248, Dearborn, MI 48126.

110.    Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's quality assurance procedures for its vehicles had been deficient since the start of the Relevant Period; (2) as such, Ford had begun to experience higher warranty costs; (3) due to the foregoing, Ford's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) Ford's profitability was therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval the 2023 LTIP and the 2024 Stock Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

111.    In addition, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel were not followed, as evidenced by the Individual Defendants (1) making and/or causing Ford to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct,

Director Code of Ethics, or the Code of Ethics for Senior Financial Personnel.

112.    Because Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg caused the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board, thereby allowing them to continue to breach their fiduciary duties to Ford; (2) ratify the selection of PricewaterhouseCoopers LLP as Ford's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve Ford's named executive officer compensation on an advisory, non-binding basis; and (4) approve the 2024 Stock Plan.

113.    Because shareholders approved the 2024 Stock Plan, the new plan became effective in place of the prior plan, allowing the Individual Defendants to materially benefit therefrom.

### *April 24, 2024 Press Release*

114.    On April 24, 2024, Ford published a press release announcing its financial results for the first quarter of the 2024 Fiscal Year (the "1Q24 Press Release"). The 1Q24 Press Release represented, among other things, that the Company's revenue for the first quarter was $42.8 billion, while also reporting a net

income of $1.3 billion.

### *April 25, 2024 10-Q*

115.   On April 25, 2024, Ford filed its quarterly report on Form 10-Q with the SEC for the first quarter of the 2024 Fiscal Year (the "1Q24 10-Q"), which was signed by Defendants Farley and Lawler. The 1Q24 10-Q also included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and representing that the "information included in this [1Q24 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

116.   The 1Q24 10-Q affirmed the 1Q24 Press Release's financial results.

117.   The 1Q24 10-Q also reported on Ford's estimated warranty and field service action costs. In reporting an increase to the estimated warranty costs, the 1Q24 10-Q stated:

|  | First Quarter | |
|  | 2023 | 2024 |
|---|---|---|
| Beginning balance | $ 9,193 | $ 11,504 |
| Payments made during the period | (990) | (1,391) |
| Changes in accrual related to warranties issued during the period | 972 | 1,091 |
| Changes in accrual related to pre-existing warranties | 226 | 397 |
| Foreign currency translation and other | (117) | (61) |
| Ending balance | $ 9,284 | $ 11,540 |

The 1Q24 10-Q reported that an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions

is a *range of up to about $1.3 billion in the aggregate*."

118.   The statements in ¶¶53-72, 83-103, and 114-117 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company's quality assurance procedures for its vehicles had been deficient since the start of the Relevant Period; (2) as such, Ford had begun to experience higher warranty costs; (3) due to the foregoing, Ford's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) Ford's profitability was therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2023 LTIP and the 2024 Stock Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

### *July 24, 2024 Press Release*

119.   On July 24, 2024, the truth fully emerged when the Company issued the 2Q24 Press Release, disclosing its financial results for the second quarter of the 2024 Fiscal Year. The 2Q24 Press Release revealed disappointing guidance as the result of "[*p]rofitability [being] affected by an increase in warranty reserves*." As such, the guidance for Ford's Ford Model e segment was lowered to "reflect[] higher

warranty costs than originally planned."

120.    In explaining the disappointing results, the 2Q24 Press Release stated:

Company net income was $1.8 billion and adjusted earnings before interest and taxes, or EBIT, was $2.8 billion. ***Profitability was affected by an increase in warranty reserves***, though efforts to lift the quality of new products are starting to pay off, with positive implications for customer satisfaction and Ford's operating performance.

121.    Defendant Lawler also admitted in the 2Q24 Press Release that "[w]e still have ***lots of work ahead of us to raise quality and reduce costs*** and complexity, but the team is committed and we're heading in the right direction."

122.    The 2Q24 Press Release revealed the final guidance as:

Capital expenditures for the year are still anticipated to be between $8.0 billion and $9.0 billion, with an enterprise-wide objective for the lower end of the range.

Outlooks for full-year EBIT are up for Ford Pro, to $9.0 billion to $10.0 billion, on further growth and favorable product mix, and down for Ford Blue, to $6.0 billion to $6.5 billion, reflecting higher warranty costs than originally planned.

### *July 25, 2024 Associated Press Article*

123.    On the morning of July 25, 2024, *The Associated Press* published an article entitled "Ford shares slide as disappointing Q2 adjusted profit rattles investors." The article revealed that the Company's warranty and recall costs in the second quarter were as high as $2.3 billion, $800 million greater than in the first quarter of 2024, and further revealed a year-over-year growth of $700 million.

124.    On this news, the price of the Company's common stock fell $2.51 per

share, or approximately 18.4%, from a closing price of $13.67 per share on July 24, 2024 to a closing price of $11.16 per share on July 25, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

125.    During the Relevant Period, the Individual Defendants caused Ford to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $727.2 million*** to repurchase approximately 54,780,000 shares of its own common stock at artificially inflated prices between November 2022 and June 2024:

| Time Period | # of Shares Repurchased | Avg. Price/Share | Total Cost to Ford | Amount Ford Overpaid By |
|---|---|---|---|---|
| **November 2022** | 35,000,000 | $13.81 | $483,350,000 | $92,750,000 |
| **May 2024** | 19,299,600 | $12.34 | $238,157,064 | $22,773,528 |
| **June 2024** | 480,400 | $11.95 | $5,740,780 | $379,516 |

126.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by ***$115,903,044***.

## DAMAGES TO FORD

127.    As a direct and proximate result of the Individual Defendants' misconduct, Ford has been seriously harmed and will continue to be harmed. The Company will be subject to vast expenditures, including, but not limited to:

(a) The approximately $115,903,044 the Company overpaid for repurchases

54

of its own common stock during the Relevant Period as alleged herein;

(b) Legal fees incurred in connection with the Securities Class Action filed against Ford and several of the Individual Defendants;

(c) Costs incurred from the compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties to Ford, including amounts received pursuant to the 2023 LTIP and 2024 Stock Plan;

(d) Costs incurred from remedying the material weaknesses in Ford's financial reporting controls.

128.    Additionally, Ford's business, goodwill, and reputation with its industry partners, regulators, and stockholders have been gravely tarnished. For the foreseeable future, the Company will suffer from a "liar's discount" from the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

129.    Plaintiff brings this action derivatively and for the benefit of Ford to redress injuries suffered, and injuries that will be suffered, as a direct result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ford and violations of the Exchange Act.

130.    Ford is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131.    Plaintiff has continuously been a stockholder of Ford at all relevant times. Plaintiff will adequately and fairly represent the interests of Ford in enforcing and prosecuting its rights.

## DEMAND IS EXCUSED AS FUTILE

132.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.    When this action was commenced, Ford's Board consisted of the following fifteen individuals: Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg (the "Director-Defendants") and non-partes Adriana Cisneros and Jon Huntsman, Jr. (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to eight of the fifteen Directors that were on the Board at the time of the filing of this action.

134.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and, simultaneously, as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused Ford to overpay by *over $115.9 million* for its own common stock during the Relevant Period. The

Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

135.    The Director-Defendants solicited the 2023 and 2024 Proxy Statements to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to Ford.

136.    The Director-Defendants also caused the 2023 Proxy Statement to call for a shareholder vote to approve the 2023 LTIP, which made shares available to Ford employees, including two of the Director-Defendants, for five years. The misrepresentations and omissions set forth in the 2023 Proxy Statement were material to shareholders in voting to approve the 2023 LTIP who would not have approved the 2023 LTIP, had they known about the Individual Defendants' misconduct. In total, the amounts received pursuant to the 2023 LTIP were: (1) 509,890 shares of RSUs by Defendant Farley on March 4, 2024; (2) 135,635 shares of RSUs by Defendant Lawler on March 4, 2024; and (3) 397,488 shares of RSUs by Defendant W. Ford on March 4, 2024. As such, the Director-Defendants who

Case 2:24-cv-13222-JJCG-KGA   ECF No. 1, PageID.58   Filed 12/03/24   Page 58 of 91

received these RSUs face a substantial likelihood of liability and demand is futile as to them.

137.     In addition, the Director-Defendants caused the 2024 Proxy Statement to call for a shareholder vote to approve the 2024 Stock Plan, which made shares available to non-employee directors of the Company, including many of the Director-Defendants, for ten years. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2024 Stock Plan, who would not have approved the 2024 Stock Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 Stock Plan at the annual meeting of stockholders of Ford on May 9, 2024, the then-existing plan terminated on December 31, 2023. After the shareholders approved the 2024 Stock Plan, the plan was effective for an additional ten years. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the false and misleading 2024 Stock Plan and the shareholders approving the 2024 Stock Plan. In total, the amounts received under the 2024 Stock Plan were as follows: (1) for Defendant Veihmeyer, 27,867 Company stock units on May 16, 2024 worth approximately $344,994; (2) for Defendants Casiano, H. Ford, Helman, Kennard, Mooney, Thornton,  and Vojvodich Radakovich, 17,366 shares of Company stock units each on May 16, 2024 worth approximately $214,991; and (3) for Defendants

English, May, and Weinberg, 25,444 shares of Company stock units each on May 16, 2024 worth approximately \$314,997. [5] As such, the Director-Defendants received material personal benefits pursuant to the transactions challenged demand is futile as to them. Thus, Director-Defendants Casiano, English, H. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg have received material personal benefits pursuant to the 2024 Stock Plan between May 2024, when the 2024 Stock Plan was approved by way of the false and misleading 2024 Proxy Statement, and the date this action was filed.

138.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Ford to issue materially false and misleading statements. Specifically, the Director-Defendants caused Ford to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, demand would be futile, and thus excused, as the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested or independent.

139.    Moreover, under the 2024 Stock Plan, the Director-Defendants are all eligible to receive stock awards under the 2024 Stock Plan, have received various amounts of stock awards under the 2024 Stock Plan, and will receive various

---

[5] These amounts are represented in Form 4s filed with the SEC on May 17, 2024.

amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan.

140.   **Defendant Farley** - Defendant Farley has served as the President and CEO and as a director of the Company since October 2020. Therefore, as the Company admits, he is a non-independent director. Ford provides Defendant Farley with his principal occupation, for which he receives lucrative compensation. Moreover, Defendant Farley solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to Ford and caused shareholders to approve the 2023 LTIP.  Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

141.   As CEO, Defendant Farley conducted little, if any oversight of the scheme to cause Ford to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in

the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Farley is also named as a defendant in the Securities Class Action. He also engaged in lucrative insider trading, obtaining personal profits of approximately $1.0 million. For these reasons, too, Defendant Farley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142. **Defendant Casiano -** Defendant Casiano has served as Ford director since 2003. Defendant Casiano also serves as a member of the Audit Committee, a member of the Nominating and Governance Committee, and a member of the Sustainability, Innovation and Policy Committee. Defendant Casiano received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Casiano solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP.  Furthermore, she solicited the 2024 Proxy

Statement, which contained false and misleading statements and contributed to the re-election of Defendants English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

143.   As a trusted Company director, she conducted little, if any, oversight of Ford's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Casiano breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144.   **Defendant English** - Defendant English has served as a Ford director since 2021. She also serves as a member of the Finance Committee, and as a member of the Sustainability, Innovation and Policy Committee. Defendant English served as an employee of Ford between July 2017 and June 2022 and most recently served as Director of Global Brand Merchandising. As a member of the Ford family, Defendant English is the daughter of Defendant W. Ford and second cousin to Defendant H. Ford, making her beholden to them. Thus, as the Company admits, she is a non-independent director.  Defendant English received and continues to receive

lucrative compensation for her role as a Ford director. She also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

145.   As a trusted Company director, she conducted little, if any, oversight of Ford's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant English breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146.   **Defendant H. Ford** -  Defendant H. Ford has served as a Ford director since 2021. He also serves as a member of the Finance Committee and as a member of the Sustainability, Innovation and Policy Committee. Defendant H. Ford previously served as an employee of Ford between February 2006 and June 2021 and most recently served as Director of Investor Relations. As a member of the Ford family, Defendant H. Ford is the second cousin of Defendants W. Ford and Defendant English, making him beholden to them. Thus, as Ford admits, he is a non-independent director. Defendant H. Ford received and continues to receive lucrative compensation for his role as a Ford director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP.  Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

147.   As a trusted Company director, he conducted little, if any, oversight of Ford's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant H. Ford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.   **Defendant W. Ford** - Defendant W. Ford has served as a Ford director since 1988 and has also served as the Board's Executive Chairman since January 1999. Defendant W. Ford previously served as Ford's CEO between October 2001 until September 2006. He also serves as the Chair of the Finance Committee and a member of the Sustainability, Innovation and Policy Committee. As a member of the Ford family, Defendant W. Ford is father of Defendant English and the second cousin of Defendant H. Ford, and they are therefore beholden to him. Therefore, as Ford admits, he is a non-independent director. Ford provides Defendant W. Ford with his principal occupation, for which he receives lucrative compensation. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach

their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP.  Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

149.   As a trusted Company director, he conducted little, if any, oversight of Ford's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant W. Ford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.   **Defendant Helman** - Defendant Helman has served as a Ford director since 2011. He also serves as the Chair of the Sustainability, Innovation and Policy Committee and as a member of the Finance Committee and a member of the Nominating and Governance Committee. Defendant Helman received and continues to receive lucrative compensation for his role as a Ford director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and

contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, Defendant Helman solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

151.   As a trusted Company director, he conducted little, if any, oversight of Ford's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Helman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.   **Defendant Kennard** - Defendant Kennard has served as a Ford director since 2015. Defendant Kennard also serves as the Chair of the Nominating and Governance Committee and as a member of the Finance Committee and the

Sustainability, Innovation and Policy Committee. Defendant Kennard received and continues to receive lucrative compensation for his role as a Ford director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP.  Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

153.   As a trusted Company director, he conducted little, if any, oversight of Ford's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Kennard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    **Defendant May** - Defendant May has served as a Ford director since 2021. He also serves as a member of the Compensation, Talent and Culture Committee and the Nominating and Governance Committee. Defendant May received and continues to receive lucrative compensation for his role as a Ford director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP.  Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

155.    As a trusted Ford director, he conducted little, if any, oversight of Ford's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant May breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.   **Defendant Mooney** - Defendant Mooney has served as a Ford director since 2019. She also serves as a member of the Audit Committee and the Nominating and Governance Committee. Defendant Mooney received and continues to receive lucrative compensation for her role as a Ford director. She also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP.  Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

157.   As a trusted Ford director, she conducted little, if any, oversight of Ford's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and

engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Mooney breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

158. **Defendant Vojvodich Radakovich** - Defendant Vojvodich Radakovich has served as a Ford director since 2017. She also serves as the Chair of the Compensation, Talent and Culture Committee and as a member of the Nominating and Governance Committee and the Sustainability, Innovation and Policy Committee. Defendant Vojvodich Radakovich received and continues to receive lucrative compensation for her role as a Ford director. She also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock

Plan.

159.   As a trusted Ford director, she conducted little, if any, oversight of Ford's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Vojvodich Radakovich breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

160.   **Defendant Thornton** - Defendant Thornton has served as a Ford director since 1996, and as Lead Independent Director since 2022. He is also a member of the Compensation, Talent and Culture Committee, Finance Committee, and the Nominating and Governance Committee. Defendant Thornton received and continues to receive lucrative compensation for his role as a Ford director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano,

English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

161.    As a trusted Ford director, he conducted little, if any, oversight of Ford's engagement in the schemeto make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Thornton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    **Defendant Veihmeyer** - Defendant Veihmeyer has served as a Ford director since 2017. He is also the Chair of the Audit Committee and a member of the Nominating and Governance Committee. Defendant Veihmeyer received and continues to receive lucrative compensation for his role as a Ford director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP.

Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

163.    As a long time Ford director, he conducted little, if any, oversight of Ford's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Veihmeyer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    **Defendant Weinberg** - Defendant Weinberg has served as a Ford director since 2016. He also serves as a member of the Compensation, Talent and Culture Committee, the Nominating and Governance Committee, and the Sustainability, Innovation and Policy Committee. Defendant Weinberg received and continues to receive lucrative compensation for his role as a Ford director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford,

W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, and Veihmeyer, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, and Veihmeyer, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan.

165.   As a trusted Ford director, he conducted little, if any, oversight of Ford's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Weinberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.   Additional reasons that demand on the Board is futile follow.

167.   **Ford Family** - Defendants English, H. Ford, and W. Ford are all members of the Ford family, related, and therefore beholden to each other. Moreover, as discussed in the 2023 and 2024 Proxy Statements, the Ford family

holds Ford Class B stock that receives 36 votes per share to regular common stock shares' receiving a single vote per share. As such, the entire Board is beholden to the Ford family as controlling shareholders, and the Director-Defendants would not be able to assess a demand with appropriate disinterestedness against them.

168.   **Audit Committee Defendants** - Defendant Casiano, Mooney, and Veihmeyer (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

169.   Ford has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Ford any part of the damages Ford suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

170.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

171.   The acts complained of herein constitute violations of fiduciary duties owed by Ford's officers and directors, and these acts are incapable of ratification.

172.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least eight of the Director-Defendants, cannot

consider a demand with disinterestedness and independence. Therefore, a demand upon the Board is excused as futile.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

173.   By reason of their positions as officers, directors, and/or fiduciaries of the Company, each of the Individual Defendants owed and owe Ford and its stockholders fiduciary obligations of care, good faith, and loyalty, and were and are required to use their utmost ability to control and manage Ford in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of Ford's best interests and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Ford and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

174.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ford, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the officers and directors of Ford were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company. By virtue of such duties, the officers and directors of Ford were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner in a fashion that complies with all state and federal laws.

(b)     remain informed as to how Ford conducts its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, such as issuing false and misleading statements, make reasonable inquiry therewith, and take steps to correct such conditions or practice and make disclosures as necessary to comply with applicable laws;

(c)     keep accurate records and reports of the business and internal affairs of Ford and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(d)     manage internal legal, financial, and management controls, such that Ford's operations comply with all applicable laws and Ford's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's stockholders would be accurate;

(e)     ensure public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to publish are truthful and accurate;

(f)      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company and its stockholders.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

175.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

177.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

178.   Under the direction and watch of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich,

Thornton, Veihmeyer, and Weinberg, the 2023 and 2024 Proxy Statements failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 and 2024 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

179.    The 2023 and 2024 Proxy Statements also failed to disclose that: (1) the Company's quality assurance procedures for its vehicles had been deficient since the start of the Relevant Period; (2) as such, Ford had begun to experience higher warranty costs; (3) due to the foregoing, Ford's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) Ford's profitability was therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2023 LTIP and the 2024 Stock Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

180.    Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, in the exercise of reasonable care, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2023 and 2024 Proxy Statements, including but not limited to the re-election of directors, the approval of the 2023 LTIP, and the approval of the 2024 Stock Plan.

181.    The false and misleading elements of the 2023 Proxy Statement led to, among other things, the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2023 LTIP.

182.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2024 Stock Plan.

183.    Ford was damaged as a result of Defendants Casiano's, English's,

Farley's, H. Ford's, W. Ford's, Helman's, Kennard's, May's, Mooney's, Vojvodich Radakovich's, Thornton's, Veihmeyer's, and Weinberg's material misrepresentations and omissions in the 2023 and 2024 Proxy Statements.

184.   Plaintiff, on behalf of Ford, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

185.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186.   The Individual Defendants, by virtue of their positions with Ford and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Ford and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Ford to engage in the illegal conduct and practices complained herein.

187.   Plaintiff, on behalf of Ford, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

188.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.   The Individual Defendants participated in a scheme to defraud with the

83

purpose and effect of defrauding Ford. Not only is Ford now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Ford by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase **54,780,000** of its own shares at artificially inflated prices, damaging Ford.

190. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

191. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ford not misleading.

192. The Individual Defendants as top executives and directors acted with

scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

193.   By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

194.   Plaintiff, on behalf of Ford, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

195.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ford's business and affairs.

197.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

85

198.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ford.

199.   In breach of their fiduciary duties owed to Ford, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's quality assurance procedures for its vehicles had been deficient since the start of the Relevant Period; (2) as such, Ford had begun to experience higher warranty costs; (3) due to the foregoing, Ford's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) Ford's profitability was therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2023 LTIP and the 2024 Stock Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

200.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which

renders them personally liable to the Company for breaching their fiduciary duties.

201.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

202.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $2.4 million.

203.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

204.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

205.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ford has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

206.   Plaintiff, on behalf of Ford, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Ford, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ford;

(c)   Determining and awarding to Ford the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Ford and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal

procedures to comply with applicable laws and to protect Ford and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Ford to nominate at least eight candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Ford restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 3, 2024

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Local Counsel for Plaintiff*

**POULIN | WILLEY ANASTOPOULO, LLC**
Stuart J. Guber, Esq.
32 Ann Street
Charleston, SC 29403
Tel: (803) 222-2222
Fax: (843) 494-5536
Email: stuart.guber@poulinwilley.com

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Hal Yurow, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29th day of November, 2024.

Signed by:

*Hal Yurow*
0B1CD8E069A0402...

Hal Yurow